No. 98-647

IN THE SUPREME COURT OF THE STATE OF MONTANA

1999 MT 73

294 Mont. 35

979 P.2d 156

IN THE MATTER OF THE GUARDIANSHIP

AND CONSERVATORSHIP OF CLARA MOWER,

An incapacitated person,

and

CLARA MOWER,

Cross-Petitioner and Respondent,

v.

MAURICE EDDIE and PEGGY EDDIE,

Cross-Respondents and Appellants.

APPEAL FROM: District Court of the Eleventh Judicial District,

In and for the County of Flathead,

Honorable Ted O. Lympus, Judge Presiding.

COUNSEL OF RECORD:

For Appellants:

Frank B. Morrison, Jr., Morrisons, McCarthy & Baraban, Whitefish, Montana

For Respondent:

Gary R. Christiansen, Warden, Christiansen, Johnson & Berg, Kalispell,

Montana

Submitted on Briefs: February 4, 1999

Decided: April 9, 1999

Filed:

_____

Clerk

Honorable John Warner, District Judge, delivered the Opinion of the Court.

¶1 This is an appeal from a judgment of the District Court of the Eleventh Judicial District, Flathead County, entered July 24, 1998, in favor of Clara Mowrer and against Maurice Eddie and Peggy Eddie, in the amount of $807,582.44, imposing a trust on certain of Eddies' property, and dismissing their petition to be appointed guardians and conservators of Mowrer. We affirm.

## ISSUES

¶2 We restate and address the issues as follows:

¶3 Did the District Court abuse its discretion when it denied appellants Maurice Eddie and Peggy Eddie's motion to disqualify respondent's counsel, grant a mistrial, and order new discovery?

¶4 Does Montana or Kansas law apply in determining if transfers of property made in Kansas from Mowrer to the Eddies were the result of undue influence?

¶5 Is the evidence sufficient to sustain the judgment that Mowrer was acting under undue

influence exerted upon her by the Eddies when she transferred property to them?

## BACKGROUND

¶6 Clara Mowrer was born September 13, 1894. She lived in Kansas until August of 1995, when she was brought to Montana by her niece, Peggy Eddie, and her niece's husband, Maurice Eddie. She has remained in Montana and now lives at a care facility in Kalispell.

¶7 Mowrer fell and broke her hip in June of 1995. She was hospitalized for about two months. The day before she was released from the hospital, Peggy Eddie arrived in Kansas. Maurice Eddie arrived in Kansas shortly thereafter. Mowrer was released from the hospital in late July 1995 and returned home. The Eddies stayed with her in her home.

¶8 On August 5, 1995, Mowrer executed a durable power of attorney to the Eddies at her attorney's office in Kansas. That same day, several of Mower's bank accounts were closed, and the funds transferred to the Eddies. Other assets, including cash and certificates of deposit, were also transferred to the Eddies.

¶9 The Eddies brought Mowrer to Montana in late August of 1995. Before the end of that year, $594,715.00 of Mowrer's assets had been transferred to Peggy and Maurice Eddie by means of the power of attorney and upon Mowrer's signature. In addition, in September of 1995, Maurice Eddie received cashier's checks in the amount of $99,950.00, from certificates of deposit that had been owned by Mowrer.

¶10 In the fall of 1995, the Eddies took stock certificates with a value in excess of $300,000.00 from Mowrer's safety deposit box in Kansas, brought them to Montana, and made arrangements with a broker for the transfer of such stock to themselves on the death of Mowrer.

¶11 In October of 1995, Maurice Eddie consulted attorney James Johnson, a partner of Gary Christiansen, concerning Mowrer making a new will and filing a gift tax return. Near the end of this meeting Johnson and Maurice Eddie also discussed a possible estate plan for the Eddies. An appointment was made to return to Johnson's office with Mowrer. That appointment was not kept. Later, the Eddies took Mowrer to an attorney in Kalispell who had previously represented them and their family. This attorney prepared, and Mowrer signed, a new will that left all of her property to the Eddies. This new will excluded her other nieces, nephews, long-time friends, and charitable organizations to which she had

bequeathed property in prior wills.

¶12 The Eddies used their power of attorney to spend Mowrer's money on living expenses and to acquire land, remodel their home, travel, and make gifts to their son and grandson. They also spent some of Mowrer's funds that are not accounted for.

¶13 During 1995, 1996 and until February, 1997, Mowrer lived with the Eddies. She then moved to the BeeHive care facility in Kalispell, where she still lives. On May 16, 1997, Mowrer revoked the power of attorney to the Eddies. Her counsel, Gary Christiansen, wrote the Eddies a letter demanding an accounting.

¶14 On June 19, 1997, Eddies filed a petition to be appointed guardians and conservators of Mowrer. She responded by resisting the appointment of either a guardian or conservator, and counterclaimed for an accounting. Substantial discovery was undertaken. The trial took seven different days between December 22, 1997, and March 10, 1998. On July 27, 1998, the District Court entered its Findings of Fact, Conclusions of Law and Judgment. The court found that Mowrer was competent, did not need a guardian or conservator, had not made gifts to the Eddies and that the transfers to the Eddies had been the result of duress and undue influence. The court ordered the Eddies to repay $807,582.44 to Mowrer, and imposed a trust on certain real property owned by Eddies to secure the judgment. Eddies' motion for new trial was denied September 22, 1998, and they appeal from such denial.

## DISCUSSION

### Issue 1.

*Did the District Court abuse its discretion when it denied appellants Maurice Eddie and Peggy Eddie's motion to disqualify respondent's counsel, grant a mistrial, and order new discovery?*

¶15 Eddies first claim that Mowrer's counsel, Gary R. Christiansen, must be disqualified, the case be remanded for a new trial, and any discovery or other proceedings in which Christiansen participated be declared a nullity, stricken, and not used for any purpose. They assert because Maurice Eddie consulted with Christiansen's partner James Johnson in October of 1995 about a possible estate plan for themselves, as well as Mowrer's estate

plan and gifts she had made to them, Christiansen had a conflict of interest. Thus, he must be disqualified from representing either side in this action.

¶16 Mowrer, acting through counsel Christiansen, called Johnson to testify on the fourth trial day, February 24, 1998. Johnson stated that he had represented Mowrer and described his October 11, 1995, meeting with Maurice Eddie only as it concerned her.

¶17 Prior to re-commencing the trial on March 4, 1998, Eddies moved for a mistrial on the grounds that a conflict of interest existed requiring that Christiansen be disqualified. The District Court heard the motion, found that Johnson had represented Mowrer and thus no conflict existed, and denied the motion. Eddies petitioned this Court for supervisory control, which petition was ultimately denied as Eddies had an adequate remedy by way of appeal.

¶18 The standard for review of the District Court's denial of Eddies' motion for a mistrial is whether the District Court abused its discretion. *Garrison v. Averill* (1997), 282 Mont. 508, 513, 938 P.2d 702, 705.

¶19 In support of their motion for mistrial, Eddies presented the District Court the affidavit of Professor David J. Patterson who instructs an ethics course at the University of Montana School of Law. Professor Patterson, based on the limited information he was given, was of the opinion that Christiansen should be disqualified from representing Mowrer based on Rules 1.8 and 1.9 of the Montana Rules of Professional Conduct, and related provisions of the American Bar Association Model Rules of Professional Responsibility. We do not necessarily disagree with Professor Patterson's interpretation of these rules, but reach a different conclusion based on an examination of the entire record, not merely the limited facts presented to him.

¶20 A lawyer may be disqualified from appearing in an action because he has previously represented an adverse party. It does not alter the situation that the relationship has terminated. The obvious reason is that an attorney cannot use information gained in confidence against the person confiding in him. *Butler Bros. Dev. Co. v. Butler* (1941), 111 Mont. 329, 351, 108 P.2d 1041, 1052; *Oar Lock Land & Cattle v. Crowley* (1992), 253 Mont. 336, 340, 833 P.2d 146, 148. Once an attorney is found to be disqualified, his firm is also disqualified. *Trone v. Smith* (9th Cir. 1980), 621 F.2d 994, 999.

¶21 The record shows Maurice Eddie consulted Johnson on behalf of Mowrer. During

such single conference they discussed Mowrer's assets, her previous actions, and what she purportedly wanted Johnson to do for her. At Johnson's insistence, an appointment was made for him to consult personally with Mowrer. Under such circumstances, Eddies could not reasonably believe that Johnson represented them. Nor could they reasonably believe that such lawyer would not be free to relate the contents of such discussions to Mowrer or her representatives. Eddies could not reasonably believe they could prevent Johnson from divulging the details of such discussion, should Mowrer desire to do so. The District Court did not err in finding Johnson represented Mowrer.

¶22 Only information concerning Mowrer was described by Johnson in his testimony. He related no information whatever concerning Eddies' assets or possible estate plan. No such information was considered by the trial court. There was no breach of confidentiality requiring that Christiansen be disqualified. *In Re Marriage of Bolt* (1993), 259 Mont. 54, 61, 854 P.2d 322, 326.

¶23 Shortly after Johnson began his testimony, counsel for Eddies advised the court:

So there won't be any problem, we will waive whatever privilege may be attached. He can testify about whatever he wants. [Transcript, p. 922.]

Johnson continued his testimony without objection. According to Maurice Eddie, he only later realized that Johnson was the lawyer he had first consulted. He then moved to disqualify Christiansen. In May of 1997, Maurice Eddie personally received a letter which clearly identified Christiansen and Johnson as members of the same firm. Extensive discovery was undertaken in preparation for trial, during which some 15 depositions of persons other than the parties were taken and were ultimately introduced into evidence. Clara Mowrer was 104 years old at the time the trial commenced. Some 28 witnesses testified at the trial which took seven days. Christiansen appeared at each of these events. Yet the Eddies made no motion to disqualify Mowrer's counsel until all discovery was completed, all depositions taken, and four days of trial had been completed. Mowrer must not be lightly separated from her counsel of choice. It cannot be gainsaid that disqualification of her counsel would be punitive insofar as Mowrer and her counsel are concerned, and any benefit to Eddies is indeed questionable. *W.T. Grant Co. v. Haines* (2nd Cir. 1976), 531 F.2d 671, 677. Alleged lawyer conflict of interest problems should be brought up as early as possible so that a determination may be made that does not unduly prejudice any party. Even assuming, *arguendo,* that the conflict we have determined does not exist

was present, under the circumstances of this case failure to object and move to disqualify within a reasonable time would constitute a *de facto* consent to Christiansen's continued representa-tion of Mowrer and a waiver of the right to object. *Trust Corp. of Montana v. Piper Aircraft Corp.* (9th Cir. 1983), 701 F.2d 85, 88.

¶24 We hold that the District Court did not abuse its discretion in denying the motions for mistrial and to disqualify Christiansen.

## Issue 2.

*Does Montana or Kansas law apply in determining if transfers of property made in Kansas from Mowrer to the Eddies were the result of undue influence?*

¶25 On August 15, 1995, Mowrer went to her bank in Lincolnville, Kansas, again accompanied by the Eddies. She then transferred some $314,859.24 to Maurice Eddie. On August 18, 1995, Mowrer signed a letter effectuating the transfer of a $10,000.00 bond to the Eddies. That same date, in Kansas, arrangements were made to transfer treasury bonds totaling $110,000.00 from Mowrer to Eddies. The parties did not leave Kansas until August 21, 1995. These transactions, along with the execution of a power of attorney from Mowrer to Eddies, took place in Kansas when Mowrer was a Kansas resident. Eddies claim that, as the District Court did not apply Kansas law in reaching its conclusions of law and Kansas law conflicts with that of Montana, the judgment must be reversed.

¶26 The determination of which state's law to apply in a particular situation is a question of law. The standard of review as to conclusions of law and questions of law is whether the trial court's determination of law is correct. *Smith v. General Mills, Inc.,* 1998 MT 280, ¶ 11, 968 P.2d 723, ¶11. The District Court applied Montana law to determine that the transfers made in Kansas were not gifts. We conclude that Montana law is applicable.

¶27 This Court has not had occasion to clearly set out the applicable considerations in making a choice of law in cases where Montana law conflicts with that of sister states. It is not necessary to do so in this instance. The laws of Montana and Kansas relating to the questions presented are substantially the same and would produce the same results. Thus, what may be termed a "false" conflict of laws is presented. In such instances the law of the forum state, here Montana, is applied. *Seizer v. Sessions* (Wash. 1997), 940 P.2d 261, 264; *Angelini v. Delaney* (Or.App. 1998), 966 P.2d 223, 227; *McDermott v. Chilton Co.* (D.C.N.

J. 1995), 938 F.Supp. 240, 243; *Hunker v. Royal Indemnity Co.* (Wis. 1973), 204 N.W.2d 897, 902; 16 Am.Jur.2d *Conflict of Laws* § 135, pp. 149, 150.

¶28 Mowrer did transfer property to Eddies in Kansas. These transfers were either gifts or they were not. In Kansas, a gift is not presumed. The burden of proof to show that a gift was made is on the donee. *Matter of Estate of Button* (Kan.App. 1992), 830 P.2d 1216, 1218; *Truax v. Southwestern College, Okla. City, Okla.* (Kan. 1974), 522 P.2d 412, 416. This is also the law in Montana. *Nieman v. Howell* (1988), 234 Mont. 471, 474, 764 P.2d 854, 856.

¶29 The District Court found the gifts were the result of undue influence exercised by Eddies over Mowrer. In Kansas, the criteria, or guiding principles, used to determine if gifts were the result of undue influence are the same as those used to determine if a testator executed a will acting under undue influence. *Heck v. Archer* (Kan.App. 1996), 927 P.2d 495, 499. The rule is the same in Montana. *Estate of DeCock* (1996), 278 Mont. 437, 444, 925 P.2d 488, 492.

¶30 In Montana, undue influence is defined at § 28-2-407, MCA, as:

(1) the use by one in whom a confidence is reposed by another who holds a real or apparent authority over him of such confidence or authority for the purpose of obtaining an unfair advantage over him;

(2) taking an unfair advantage of another's weakness of mind; or

(3) taking a grossly oppressive and unfair advantage of another's necessities or distress.

¶31 To determine if gifts were the result of undue influence, Montana courts examine: (1) any confidential relationship of the person alleged to be attempting to influence the donor; (2) the physical condition of the donor as it may affect the ability to withstand influence; (3) the mental condition of the donor as it may affect the ability to withstand influence; (4) the unnaturalness of the disposition as it relates to showing an unbalanced mind or a mind easily susceptible to influence; and (5) the demands and importunities as they may affect a particular donor taking into consideration the time, place and surrounding circumstances. *DeCock*, 278 Mont. at 444, 925 P.2d at 492; *Christensen v. Britton* (1989), 240 Mont. 393, 398, 784 P.2d 908, 911.

¶32 As a part of these criteria, Montana courts examine the surrounding circumstances and the special facts of each case. Any gift must be made by the exercise of the free will of the donor and when the gift is the result of fraud, duress, or undue influence, it may be set aside. Consideration is given to the nature of the relationship between the donor and the donee, the donor's susceptibility to undue influence, and the reasonableness of the transfers in light of the existing circumstances. *Patterson v. Halterman* (1973), 161 Mont. 278, 283, 505 P.2d 905, 908 (citing 38 C.J.S. *Gifts* §§ 13, 34, now 38A C.J.S. *Gifts* § 33, p. 211).

¶33 In Kansas, undue influence is not specifically defined by statute. It is, however, determined by looking at similar criteria to those used in Montana:

Once a confidential or fiduciary relationship is found, the burden shifts to the party who is the beneficiary of the transfer to show that the transfer was made in good faith and without undue influence.

"'The test of undue influence is whether the party exercised his own free agency and acted voluntarily by the use of his own reason and judgment, which may be determined from all the surrounding circumstances, including the relation of the parties, the time and manner of making suggestions or giving advice, the motive, if any, in making suggestions, and the effect upon the party so acting.'" *Frame, Administrator v. Bauman,* 202 Kan. 461, 468, 449 P.2d 525 (1969) (quoting *Cersovsky v. Cersovsky*, 201 Kan. 463, 467, 441 P.2d 829 [1968]).

*Logan v. Logan* (Kan.App. 1997), 937 P.2d 967, 972.

¶34 Once a confidential relationship is found, the Kansas courts look at the facts surrounding the gift and determine if it was made under suspicious circumstances. There is no laundry list of what constitutes suspicious circumstances. The analysis is made on a case-by-case basis. *Heck*, 927 P.2d at 500.

¶35 In determining whether undue influence is present, both Kansas and Montana first

determine if a confidential relationship exists. Then, other circumstances are examined. While the phrase "suspicious circumstances" used in Kansas is not exactly the same as "surrounding circumstances" used in Montana, the application of either to the facts found by the District Court leads ineluctably to the same result. There being no substantial conflict between the laws of Kansas and Montana, and as the result would be the same under both, the District Court correctly applied Montana law.

## Issue 3.

*Is the evidence sufficient to sustain the judgment that Mowrer was acting under undue influence exerted upon her by the Eddies when she transferred property to them?*

¶36 Eddies argue that the District Court's findings of fact were not sufficient under Kansas law to set aside Mower's transfers of property to them based on coercion or undue influence. As we have determined that Kansas law is similar to Montana law, and that Montana law was correctly applied, we have reviewed the record to determine if the evidence supports the judgment. When reviewing the findings of fact and conclusions of law of a district court sitting without a jury, this Court has repeatedly held such findings and conclusions will not be disturbed if supported by substantial evidence and the law. The evidence will be reviewed in the light most favorable to the prevailing party in the district court, and the credibility of witnesses and the weight assigned to their testimony is for the determination of the district court. *Arrowhead, Inc. v. Safeway Stores, Inc.* (1978), 179 Mont. 510, 513, 587 P.2d 411, 413.

¶37 Conflicting evidence was presented concerning whether the gifts and other transfers from Mowrer to the Eddies were freely made. Much of the evidence presented at trial consisted of witness testimony. The District Court heard all of the evidence, considered the circumstances, and found that Mower and those witnesses presented by her were credible. The court did not find the Eddies' version of the facts to be true.

¶38 After hearing the evidence, the trial court made detailed findings of fact. It found that Mowrer was physically weak when the Eddies arrived at her home in Kansas. They moved into her home and immediately secured several hundred thousand dollars of her money. The Eddies then moved Mowrer to Montana, far from her other family and long-time friends, and kept her isolated in their home. The Eddies changed their phone number, and the new number was unlisted. Visitors wishing to see Mower were discouraged, and when

they did see her, they were allowed to visit only in the presence of Maurice or Peggy Eddie. Caregivers were instructed not to discuss Mower's assets with her and were instructed not to allow her to have visitors. During the time Mower was isolated the Eddies continued to have her assets transferred to themselves, their children and their grandchildren. The District Court, after hearing the witnesses testify, specifically found that while Clara Mowrer was mentally competent, she was under the absolute and inappropriate control of the Eddies, that she was susceptible to undue influence because of advanced age and physical infirmity, and that Eddies took advantage of her weakness and their control over her to secure an unnatural disposition of essentially all of her property to them. The record supports each of these findings. In making a determination whether undue influence was exercised in a case where the credibility of witnesses is of prime importance, the determination of the weight given to the testimony is the primary function of the trial judge. *Cameron v. Cameron* (1978), 179 Mont. 219, 228-29, 587 P.2d 939, 945. Viewing the evidence in the light most favorable to the prevailing party, Mowrer, it is substantial and sufficient to sustain the judgment.

Affirmed.

/S/ JOHN WARNER

District Judge, sitting in place of

Justice Jim Regnier

We concur:

/S/ J. A. TURNAGE

/S/ KARLA M. GRAY

/S/ JAMES C. NELSON

/S/ ROY C. RODEGHIERO

District Judge, sitting in place of

Justice William E. Hunt, Sr.